May it please the Court. Good morning, Your Honors. Jane Nelson on behalf of Joseph Avila. I'll do my best to watch my own clock, and I'll try to reserve two minutes for rebuttal. Our first claim, Your Honors, is the sufficiency of the evidence. And I think I'd like to make two predicate points on that issue. First, that I think are both either undisputed or undisputable. Number one is that the body camera evidence was at the heart of the case, particularly on Count 1, but I also think it was integral to the Court's finding on Charge 4 as well. The second is that the body camera was never introduced into evidence. Now, in our current procedural posture, what that means is that under Rule 10, it's not available for consideration by the Court. So when I say the evidence was insufficient, and the government responds by saying no, body cam, the Court the government is asking the Court to do something forbidden by Rule 10. And that distinguishes our case from the Brown case cited by the government, in which at the sentencing hearing, the district court, Nungpro Tung, actually admitted the evidence. You know, our case law is pretty lenient as to whether or not there has to be a formal admission into evidence of something like this. And I don't see that this is not admitted for purposes of actually being properly in front of the Court. It may be challengeable on other grounds, but our case law is pretty lenient in terms of whether there needs to be a formal admission and a stamp and all that stuff. Well, actually, Your Honor, we've cited two cases from the Brown case and the Kirshner case, which say the opposite. And I haven't seen anything in our particular matter cited by the government that contradicts our cases. And unfortunately, under normal circumstances, I would potentially ask the Court for an opportunity for supplemental briefing. But in light of our expedited nature, that's probably not, that's not really a great idea. Breyer. Why don't you assume that it was properly, that it was admitted? Why don't we take it from there? So we'll turn to the constitutional issue then. And I think before I dive into the please take a look at the Comito case, because I think Comito is about as close to our case as you can find in the case law, and it presents a pretty clear roadmap for the Court about why Mr. Avila warrants relief under the Ninth Circuit precedent. But specifically with the balancing test, on Mr. Avila's side, I think it's a little bit more straightforward and a little bit more uncontested. We have an unsworn verbal allegation by Ms. Fuentes, who is obviously a biased person against Mr. Avila. Well, she kind of is and she kind of isn't. That's part of the issue, right? She's a girlfriend and she's not. She likes him and she doesn't, right? So, yeah. Well, she was, I think the record reflects that she was really angry with Mr. Avila. And so I think the record does reflect bias against her. Well, she might have been had he shot at her. True. But she was angry at him before the alleged incident. Which I agree with. That's correct. Thank you, Your Honor. And in fact, the district court referred to her as a gutter mouth in respect to the way she was speaking to him and text messaging him. So I think under Comito, we have facts that establish that Mr. Avila's interest in confrontation under the Constitution was at its apogee. The government side of the balance is I think the more contested side, and I'd like to emphasize two points in this respect. One is the reliability-slash-excited-utterance issue. And I hope the Court has had an opportunity to review the body cam evidence before the hearing today, or at least you will after the Court. The Court's case law is clear that to make an excited utterance, there has to be neither an opportunity for reflection nor reflection itself. And when you watch the body camera video, to me it's crystal clear. Officer Jaramillo asks her, who did this? Who put the gun behind your back? She pauses. She wipes her nose. She kind of looks around. And she says, um, Joseph? And I'm not trying to be glib by reenacting, but that's truly what she did. And to me, that reflects literally reflection. She was literally reflecting about what she was going to say. Was she going to deny it had happened? Or was she going to say it was Joseph? Was she going to say it was somebody else? You could see the gears turning in her head. That takes this case outside of an excited utterance, and that removes the traditional indicia of reliability that the government has been relying on. And it's actually kind of an interesting case study in the intersection of modern technology and these traditional hearsay exceptions, because when you have the body camera evidence, you don't have to rely on Officer Jaramillo. You watch her yourself. And you say, that's not an excited utterance. She's reflecting. The other major point on the government side is the question of good cause. Now, the case law, including Comiteau, not to sound like a broken record, made clear that it's the government's burden to establish good cause. That's their burden in this situation. And what we have from the case agent is a concession that she made zero effort, zero, to bring Mr. Avila, to bring Ms. Fuentes to Mr. Avila's hearing. What she said was in early January, two or three weeks before, we don't know exactly when, we were trying to find her for a different proceeding. And I contend, Your Honors, that the government has studiously refused to introduce into our record what that other proceeding was. The record reflects that Mr. Avila's State case involving Ms. Fuentes was over by then because it was dismissed at some point by the State authorities in 2016. So whatever the Federal government was going after her for in early January doesn't necessarily have any equivalence to why she would have potentially maybe dodged them for our case. So I hope that makes sense, Your Honors. They're trying to draw a parallel between her dodging them allegedly in early January. So they throw their hands up and they say, well, she would dodge us again for Mr. Avila's hearing. But they haven't met their burden to introduce any evidence actually supporting that inference, to translate whatever she was doing allegedly in early January to whatever would have been happening in Mr. Avila's hearing. And as I recall, she had two addresses and they chased her down as to one, not both. She did, Your Honor. She had two addresses. She had two phone numbers. And the case agent admitted on the record she only tried one address and she only tried one phone number. So I contend with the resources of the Federal government to say that we couldn't find her, we throw our hands up, I think is a bit of a stretch for me, Your Honor. You know, they didn't do, there's no evidence that they tried to just hang out outside of her house and try to just wait for her to see either of the houses, not even the one that they said they visited. They give her, they give her son a business card and then they expect her to come find her. I think, frankly, the record could easily support inference that they were going after her for something. And so, of course, she's saying, I'm not going to talk to them. We don't know what they were going after her for because the government declined to introduce that information. Can I take you back to excited utterance for a moment? Sure. So what do we, how do we review that? Abusive discretion? Plain air? Well, in the context. Factual finding? Clearly erroneous? When the district court judge said it was an excited utterance? Well, the broader constitutional claim is de novo or, well, yes, de novo. It's a constitutional issue. And within that as a sub-issue. Well, he's, let me, does it make a difference that he even treated it as an excited utterance? Yeah, there's some support in the case law that says if it does meet a hearsay exception, then you can, it adds weight to the reliability of the hearsay. Let me ask you, if it is, if we conclude that it is, that the district court judge didn't air whatever standard you apply there. Yes. And it was an excited utterance at the time she made the statement, what does that mean? Does that end the analysis? No, not at all. It adds a little bit of weight to the government side of the balance because the reliability of the evidence is one of the factors in the flexible balancing analysis. But the case law is clear. This is the Hall case, Your Honors, authored by Judge Wardlock. She found that as to some of the evidence that it did satisfy a hearsay exception, but she continued with the whole analysis. And that's what I would ask the Court to do. Even if you disagree with me that it is an excited utterance, I ask the Court to complete the entire analysis, because the scales weigh so heavily on Mr. Avila's side of this that he should still win. And I think there's even another case, I'm sorry, Your Honors, it escapes me, where there was some, you know, there was a finding that by the Ninth Circuit that the evidence had some indicia of reliability, but the Court still granted relief because it's an important issue. And if I could, Your Honors, if I've answered your question, may I reserve the rest of my time? Okay. Thank you. Thank you. Morning, Your Honors. I'm Kim Sanchez. I'm the Assistant U.S. Attorney who handled the criminal matter in this case, and I also handled the contested hearing. I wanted to respond to some of the questions that the Court posed regarding the excited utterance. In the Walker case, 117 of 3rd 417, this Court held that the standard of review for a rule of evidence is de novo. So looking at the video, the government has a different perspective than the defense as to whether there was reflection or as to whether this was an upset woman who just was shot at and believed that she may have been shot and was speaking to the police. But she did pause. I mean, it wasn't as though, oh, my God, I've been shot, and John didn't. No, it was, who shot you? She did. She paused momentarily. She did pause momentarily. And it may well qualify under an abuse of discretion standard for admission as an excited utterance, but as we're trying to evaluate it in terms of how trustworthy it is as we put it into the due process business, the fact that it might have been admissible under an abuse of discretion standard for, as an exception to hearsay, under excited utterance, that doesn't automatically make it trustworthy. We weigh it, right? Correct, Your Honor. And I think the other factors weigh heavily in regards to the reliability of the statement, the corroborating factors, that being the 911 caller, the independent female who identified an older model. I believe it was Integra or Acura that was tan and was related to the shooting. The Acura Alexis, but it turns out it's an Infinity. And the, yes, which is similar in appearance to the Acura Alexis. And then Ms. Fuente's statement that it was, in fact, a tan Infinity, and the officers finding that the defendant had a, Mr. Avila had an Infinity registered to him, finding the car, and then finding 9-millimeter bullets inside of the door in the car, which were the same caliber as the casing that was found at the scene. And in fact— Although not the same brand, correct? I don't believe they were the same brand. They were the same caliber. Well, now, this incident of this alleged shooting is rather unusual, to say the least. Ostensibly, it happened in a residence, and she winds up with a bullet somehow in her body, but wound up stuck in her clothing. Now, that's kind of rare, to say the least. And puzzling, given the fact that she starts out by what you claim is an utterance, spontaneous, but she has time to contrive a lie. So, in that same conversation with the policeman, she lies about her relationship with the alleged shooter, right? She wasn't forthcoming about her relationship with the shooter. I believe the question was whether it was her— Not forthcoming is not the same thing as lying. You were asking us whether he lied, she lied. I viewed what her statement was, I don't know that they were boyfriend and girlfriend. From reading the Facebook messaging, it appeared that they had a sexual relationship for sure. Whether they were ever boyfriend and girlfriend, that wasn't clear. And I believe that was the question, whether he was a boyfriend or whether he was an ex-boyfriend. But I don't think that it was a forthcoming answer to say no to either of those questions, given that there clearly was an intimate relationship between the two of them previously. But that was false. To say the least, it was false. It was deceptive. And it was—well, if I assert that it's false, you can't really contradict that, can you? No, I'll concede that— All right. And that was all in this same conversation that you assert was spontaneous. There was a break.  Fifteen minutes. Fifteen-minute interval, right? I don't know if it was 15 minutes, but the officers searched the apartment, and then they came back out and they had a conversation about their relationship. So there was a break in between the time where she identified Joseph Avila and the point where there was a discussion about whether he was her boyfriend or ex-boyfriend. Now, you concede that on the confrontation issue, the government's efforts to produce the witness are important. Yes, they are. Very important. They are. And you have no contradiction to what counsel has represented by way of your efforts, right? There's one clarification for sure. Okay. In terms of there being two addresses or two phone numbers in the police report, that police report was from the shooting, which was in April of 2016. Agent Reynolds met with Ms. Fuentes in October of 2016 at her residence, and Ms. Fuentes gave Agent Reynolds a phone number. So the most recent information about the address and the phone number of Ms. Fuentes came directly from her in October of 2016 when she provided that to Agent Reynolds. And so then after that, Agent Reynolds attempted to contact her at the address where she had contacted her on that day, which was her residence, in October of 2016. And by calling the phone number that Ms. Fuentes had given her, Agent Reynolds and other agents made attempts to contact her. And the phone number was no longer in service. I have two questions for you. One, you said it's a de novo review here on the excited utterance. On the excited utterance. Right. So if we take a look at the video and read the transcript and whatnot, and we conclude de novo that it's not an excited utterance, what's the effect of that? The effect is weighing that in the overall balancing test of the due process analysis. It loses any reliability based on an excited utterance. I don't believe it loses any reliability, even if it doesn't meet the excited utterance standard. Well, the fact that it's an excited utterance seems to help on the reliability. It does. It does. So you lose that little you lose that. You would lose that element of the reliability. So if you do that, is there still enough in the record to support what the district court did by a preponderance? The standard is only a preponderance of the evidence. There is. So in addition to that being an excited utterance, the other identifying factors included, as I mentioned, the car description, the 9-millimeter casing, the Facebook posts that were two days after the shooting where Ms. Fuentes had indicated that she was angry that he had shot at her and he should have killed her. I believe that's what she said, that he pulled the trigger, you should have killed me, which tends to corroborate the fact that she at least believed that he was the one who had pulled the trigger. Go ahead. Finish up. My other question, and I guess I have multiple questions, my other question was, in your red brief you talk about a distinction between if we were under the Sixth Amendment confrontation clause, which is a higher standard technically, I guess, because you have a constitutional right to confrontation. And here we're under Morris-Everett v. Brewer, Fifth Amendment-embedded constitutional opportunity, which is reflected in the federal rules of criminal procedure as well. Are the rights coextensive? They're different. But are they coextensive? Is one less than the other? Is one less demanding than the other? Yes. The due process right with respect to the supervised release hearing is less onerous than the Sixth Amendment confrontation clause, because Crawford doesn't apply to the supervised release hearing context. And Crawford is more constraining than the due process standard under Morris-Everett v. Brewer. But is there any Crawford concern under the Fifth Amendment? No. None whatsoever? Crawford doesn't apply to the supervised release violation hearing. But just as a matter of due process. I mean, is an excited utterance testimonial or non-testimonial? Non-testimonial. So under the Fifth, does it make a difference? Under the Fifth Amendment, it would increase reliability, as Your Honor had noted, if it's an excited utterance. But I don't believe whether or not it is an excited utterance is determinative as whether the court could consider it or whether it was admissible. Okay. The only matter I wanted to correct was, Your Honor, the shooting wasn't inside of a residence. The shooting occurred on the street. And so the 911 caller was on the street and observed the shooting. And that's where the casing was found. And then Ms. Fuentes went back to her apartment, which was nearby. Okay. Okay. Thank you. You've saved about two minutes. With respect to whether an excited utterance would be testimonial, Your Honor, I think the analysis would be the statements to investigating officers are testimonial. And that was one of the primary holdings of Crawford itself. So the statement so for Sixth Amendment purposes, it's absolutely testimonial. And, of course, we're in a different world a little bit with due process because actually the Hall case I mentioned before is the one that held that Crawford doesn't apply to this due process analysis. The government is reciting reasons to believe that Mr. Avila did it by preponderance of the evidence, regardless of the body cam video. I would refer the Court to citations we've made. The ones I just came up with now are ER 13 to 14 and ER 74 to 75. The record is replete with concessions by the government and the district court about how important this body cam video was to the finding, especially on Charge 1. And our contention is that the commonality of 9-millimeter ammunition ties it into Charge 4 as well. There are lots of reasons to disbelieve Ms. Fuentes. And so to say that this is some kind of slam-dunk based on, you know, the fact that there was 9-millimeter ammo here and 9-millimeter ammo there is really a stretch. She, as Your Honor's pointed out, she lied during the excited utterance. That's actually almost a quote from the district court, which I found kind of humorous. She was vitriolic and angry at Mr. Avila leading up to the incident. She has a history of ‑‑ she has a conviction for lying to law enforcement. So this is a pattern that's demonstrated in the record. She has violent felony convictions. And so there are lots of reasons why putting her on the stand and asking her hard questions under oath in front of a United States district judge could definitely have made a difference. And that's why the due process ‑‑ that's really the crux of the due process violation in this case. And I'm running out of time unless the court has any other questions. I have one question. Your client was never charged with any offense by the state for this shooting or alleged shooting? He was. And he was charged in 2016 in state court, and they dismissed it. I see. And then the feds picked it up as a supervisory case violation. Okay. It was dismissed. Yes. And it was, Your Honor, just to clarify, too, it wasn't a bullet stuck in her clothing. It was a bullet fragment. And that's why the government has repeatedly said in this brief, he shot her, he shot her, he shot her. The record doesn't support that. There was a bullet fragment, a small bullet fragment stuck in her bra strap. I see. And so it was not a bullet that actually made contact with her body. Can I ask just a practical question? Sure. What's the difference in sentence if you prevail on your claims here and count one is not count? What happens then? It's a considerably more aggravated case with a shooting involved, Your Honor. I mean, possessing an Altoids canister of 9-millimeter ammunition is a considerably different offense. Under the guidelines, does it make a difference in the ---- That's a good question. I don't recall under the guidelines. But certainly as a matter of, you know, 3553A, it absolutely does. Possession versus discharge is, I mean, as a matter of common sense. Okay. It's a big difference. I was just curious. And one last question. Nobody's mentioned it in an oral argument. But I gather that you do object, I think it's Condition 6, on Internet usage. Yes, Your Honor. There's absolutely no basis in the record to say that Mr. Avo's conduct on the Internet has anything to do with any of this. That's plain error review? Yes. Yeah, yeah. Okay. But that's still alive. It's definitely plain error, and I definitely stand on that claim, yes. Thank you, Your Honor. Thank both sides for your argument. United States v. Avala, submitted for decision. The next case this morning, United States v. Dooley.
judges: Leavy, W. Fletcher, Paez